**FILED**

FEB 01 2012

Clerk, U. S. District Court
Eastern District of Tennessee
At Knoxville

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT KNOXVILLE, TENNESSEE

| | |
|---|---|
| SOUTHLAND HEALTH SERVICES, INC., PALADIN HOLDINGS, INC., Florida Corporations, by and for themselves and all associated subsidiaries herein named and LARRY N. LUNAN, Individually,<br><br>Plaintiffs,<br><br>v.<br><br>BANKPLUS, a Mississippi Corporation, CLANTON DUBOSE, DUDLEY BELL, ALAN T. WALLS, SONNY BURDINE and SANDRA DUBOSE,<br><br>Defendants. | Case No.:<br>3:12-CV-53<br>Phillips/Shirley<br><br>**COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

Southland Health Services, Inc. ("Southland"), Paladin Holdings, Inc. ("Paladin"), and Larry N. Lunan (hereinafter collectively "Plaintiffs"), by and through their attorneys as and for their complaint allege as follows based upon personal knowledge of Larry Lunan and investigation of counsel:

### I.    NATURE OF THE ACTION

1.    Plaintiffs bring this action to recover monies unlawfully taken from Southland and its wholly owned subsidiaries through bank accounts maintained at Defendant BankPlus which were controlled by Southland's former Chief Operating Officer ("COO"), Defendant Clanton Dubose ("C. Dubose"), and its former Controller, Dudley Bell ("Bell"), and which were concealed from Plaintiff Larry N. Lunan ("Lunan"). The unauthorized taking of over $1 million through BankPlus of total approximately $3.5 million was facilitated, aided and abetted and/or concealed by Defendant BankPlus.

2. The unauthorized takings – which began in early 2005 and continued through 2008 – were the proximate cause of Southland's closing of its operations, loss of ambulance service contracts and loss of millions of dollars in Southland assets. Plaintiffs also bring this action to recover for the damage to Southland's business and for lost profits. BankPlus' actions facilitated and concealed the takings by C. Dubose and Bell from the Company's accounts held at (and away from) Bank of Vernon. This conduct by BankPlus allowed C. Dubose and Bell to wrongfully take approximately $3,500,000 collectively (known to date). Of this total, approximately $1,050,000.00 was from and through BankPlus accounts of monies that belonged rightfully to Southland. BankPlus' actions therefore directly caused Plaintiffs to suffer further damage in the amount of at least $50 million. The maintenance of a concealed and unauthorized Southland account at BankPlus over which Bell and C. Dubose exercised exclusive control enabled and ensured the concealment of unauthorized disbursements.

3. Plaintiff Lunan also brings this action to recover the value of his ownership interest in Southland and for BankPlus' conversion of his shares of stock in Paladin and Southland, which in breach of its contractual obligations BankPlus wrongfully held as collateral long after the loan for which they were pledged as security had been paid. BankPlus never notified Lunan that the loan had been paid and that the shares were eligible for release to Lunan. In so doing, BankPlus breached its contract with Lunan and such breach caused Lunan damage and loss of opportunity to sell such shares for at least several million dollars. BankPlus' wrongful refusal to return the shares to Lunan deprived Lunan of their economic benefit all to his loss and damage. BankPlus' wrongful retention of Lunan's shares also allowed C. Dubose to secure another loan from BankPlus at the expense of Southland, which

in turn allowed C. Dubose and Bell to continue their scheme of unlawful taking of Southland assets. As a result of aiding and abetting by BankPlus, Defendants C. Dubose and Bell fraudulently induced Lunan to advance $2.2 million to Southland leaving Lunan with an uncollectible receivable and unpaid salary exceeding $3.5 million from the companies.

## II.    PARTIES

### A. Plaintiffs

4.    **Plaintiff Southland Health Services, Inc.** (together with its subsidiaries, "Southland"), a for-profit Florida corporation with its principal place of business at 3428 Memorial Blvd., Kingsport, Tennessee, 37664, was at all relevant times wholly-owned by Plaintiff Paladin Holdings, Inc. through March 2007 and Paladin was the major shareholder thereafter. From December 2004 through 2008, Southland was the sole owner of multiple operating subsidiary entities, including Southland of Virginia, Inc. (formerly known as Southland Health Services LLC), Southland Health Services of Georgia, Inc., Southland Health Services of Alabama, Inc., MedExpress of Mississippi, L.L.C., Extended EMS, Inc., TWC, Inc., Emergystat, Inc., Emergystat of Sulligent, Inc., and other subsidiaries, through which Southland offered ambulance services in approximately seven states across the south. Southland also maintained an office in Vernon, Alabama, where Defendants Bell and C. Dubose primarily worked.

5.    **Plaintiff Paladin Holdings, Inc.,** (hereinafter "Paladin") is a publicly held Florida corporation, with its principal place of business at 3428 Memorial Blvd., Kingsport, Tennessee 37664 and at all relevant times was at least the majority shareholder of Southland.

6.    **Plaintiff Larry N. Lunan** is a resident of Kingsport, Sullivan County, Tennessee, and was over the age of nineteen (19) years at all times pertinent herein. At all

times, Larry N. Lunan, was the majority shareholder of Paladin and indirectly the majority shareholder Chief Executive Officer and Chairman of the Board of Directors of Southland and all its operating subsidiaries. At all relevant times, Lunan worked primarily out of the Company's Kingsport, Tennessee office.

7. The wholly owned operating subsidiaries of Southland Paladin and Lunan have each assigned for value to Southland any and all claims against the named defendants in this Complaint that arise out of facts set forth in this Complaint.

### B. Defendants

8. **Defendant BankPlus** was founded in 1909 as Citizens Bank & Trust Company, a wholly owned subsidiary of BancPlus Corporation, a Mississippi corporation with more than $2 billion in assets.

9. **Defendant Clanton Dubose** ("C. Dubose"), is a resident of Vernon, Lamar County, Alabama, and is over the age of nineteen (19) years and was the Chief Operating Office of Southland at all times relevant to this action.

10. **Defendant Sandra Dubose** ("S. Dubose"), is a resident of Vernon, Lamar County, Alabama and is over the age of nineteen and is and was the wife of C. Dubose at all relevant times. C. Dubose used S. Dubose's bank accounts with her knowledge and consent to take Southland funds without knowledge or consent of Southland.

11. **Defendant William Dudley Bell, Jr.** ("Bell"), is a resident of Missouri, and is over the age of nineteen (19) years and served as Controller at all relevant times during his employment at Southland.

12. **Defendant Alan T. Walls** ("Walls"), was the CFO of Southland at all relevant times.

13. **Defendant Sonny Burdine** ("Burdine") was at all relevant times a fiduciary of Southland after it purchased Emergystat in 2004/2005. Defendant Burdine facilitated the scheme to take unauthorized sums by concealing material information from Plaintiffs and in being the initial liaison between C. Dubose, Bell and BankPlus for the creation and maintenance of unauthorized bank accounts bearing the name of Southland entities as well as a non-existent entity: "Emergystat of Yazoo."

14. Defendants Bell, C. Dubose, S. Dubose, Walls, and Burdine are collectively referred to herein as the "Individual Defendants."

## III. JURISDICTION AND VENUE

15. Jurisdiction exists under the provisions of 28 U.S.C. § 1332 (a), et seq., which grants this court jurisdiction in civil actions on the basis of diversity of citizenship where the matter in controversy, exclusive of interest and costs, exceeds seventy-five thousand dollars ($75,000.00). Plaintiffs are all citizens of either Tennessee, or Florida while all Defendants are citizens or residents of Mississippi or Alabama or Missouri. This Court also has jurisdiction pursuant to 18 U.S.C.A. § 1964(c). Further, under 18 U.S.C.A. § 1391(b), venue is proper in any district in which a substantial part of the acts, events, or omissions occurred that gave rise to the claim for relief. The named Plaintiffs are or were residents or resident corporations residing within this district at the time of the events forming the basis of this complaint. Venue is also proper under Title 18 U.S.C.A. § 1965(a), which provides that venue for civil actions arising under the Racketeer Influenced and Corrupt Organizations statute ("RICO") may be instituted in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs.

## IV. FACTUAL ALLEGATIONS

### A. Southland Prospered Following Its Acquisition by Paladin Until Defendants' Unlawful Takings Caused Its Collapse

16. On February 4, 2005, (with an effective date December 1, 2004), Paladin purchased all of the outstanding stock of Southland from its prior owner, Glenn Crawford, thereby becoming Southland's sole owner. Southland, through its subsidiaries, was engaged in the business of providing ambulance and emergency medical services to areas in Alabama, as well as in other states, including Mississippi, Georgia, Virginia, Tennessee, Kansas, Louisiana, and Florida and employed over 800 people.

17. As stated in its Quarterly Report on Form 10-Q filed with the Securities & Exchange Commission ("SEC"), for the quarter ended March 30, 2005 Southland had quarterly revenues of $11,105,561.

18. After Paladin took over Southland its operating results and financial condition improved materially under Plaintiff Lunan's stewardship. For example, for the quarter ended March 30, 2005, Southland's operating income results were $1,086,820 as compared to $715,603 for the prior year. For the quarter ended June 30, 2005, Southland's operating income results were $1,361,661 as compared to a loss of $772,029 for the same period of the prior year. For the quarter ended September 30, 2005 the operating income results were $1,734,755, as compared to $987,917 for the same period of the prior year. For the quarter ended December 31, 2005 the operating results were $808,390 as compared to a loss of $2,735,647 for the same period of the prior year.

19. After acquiring Southland, Plaintiff Lunan and Paladin recapitalized Southland's operations, continued to provide and secure working capital, and expanded

Southland operations, greatly increasing revenues, net income and cash flow until the cash drain from Defendants' takings took its fatal toll on Southland in 2008.

## B. Individual Defendants Resisted Lunan's Attempt to Consolidate Southland's Operations into Vernon, AL

20. Southland operated ambulance services in seven states, including 26 counties in Mississippi. For each county in which Southland operated, the Company maintained a small office or "station" for the purpose of overseeing the Company's employees in that county.

21. At the time Paladin took control of Southland, every county's operations – with the noted exception of Yazoo – processed billing and payroll through the Company's Vernon, Alabama office. All entities were instructed by Lunan to process billing and payroll through the Company's depository accounts at Bank of Vernon ("BOV").

22. Shortly after Paladin took control of Southland, Plaintiffs learned from Southland's officers, Alan Walls and C. Dubose, that Southland's prior owners handled the banking and accounting of the Yazoo county business separately from the rest of the Southland entities. At that time, revenue and the subsidy checks from Yazoo County for ambulance services were deposited into a depository account at BankPlus, from which the Emergystat payroll and expenses were to be paid.

23. At that time, the manager of the Emergystat Yazoo station was defendant Sonny Burdine. Sonny Burdine had served as manager of Emergystat Yazoo station since the operation was bought out by Southland's prior owner, Glenn Crawford. Prior to that, Sonny Burdine had been the owner of the Yazoo county operation. After Southland's purchase of Yazoo, Defendant Burdine remained employed at Yazoo until 2006 pursuant to a contract signed before Southland took over Yazoo.

24.    According to Walls and C. Dubose, Glenn Crawford maintained a separate account for Emergystat of Yazoo at BankPlus so he could "skim" monthly checks written to himself without having the checks processed by the personnel in Vernon and to thereby evade detection for tax purposes. Upon learning of this, Lunan ordered all of Yazoo's revenues and accounts to be handled at headquarters in Vernon, Alabama.

### i.    Consolidation of the Yazoo Office

25.    In or around May or June of 2005, Lunan, on behalf of Southland, consulted with C. Dubose and Bell about consolidation of Yazoo's administrative operations and finances into the centralized operations in Vernon.

26.    Lunan instructed C. Dubose and Bell to consolidate billing and payroll operations of Yazoo County into the Vernon Office and to ensure that the Bank of Vernon would be the only depository bank for the deposit of revenue and subsidiary checks generated by Southland's Mississippi operations. Lunan further instructed C. Dubose and Bell to ensure that payroll was also processed through BOV.

27.    Defendant C. Dubose expressed concern over the consolidation because significant "political considerations," would mean that closing the BankPlus bank account in Yazoo might result in the loss of Southland's ambulance service provider contract with Yazoo County.

28.    C. Dubose and Bell explained that Burdine had absolute control over the Yazoo County Board of Supervisors, who controlled the county's contract with Southland. Burdine's wife was the office manager at Emergystat Yazoo's office, and Burdine's daughter was the office's bookkeeper and check writer. According to C. Dubose and Bell, centralizing the Company's functions into Vernon, Alabama would immediately eliminate the positions of

Burdine's wife and daughter according to C. Dubose, possibly causing Burdine to retaliate by inducing the Yazoo County Board of Supervisors to terminate Southland's ambulance contract.

29.     Notwithstanding the potential revenue loss, Lunan directed C. Dubose and Bell to consolidate or close the Yazoo County administrative operations and to cease using its BankPlus account for Southland revenue deposits. When Lunan stated that he would go to Yazoo to effect the changes himself, C. Dubose volunteered to personally "handle" the changes instead.

30.     Following the consolidation, Southland's office in Vernon processed all billing for Yazoo County transports. Southland's office in Vernon office processed Payroll checks for its employees in Yazoo County and according to Bell's information to Lunan paid the majority of its operating expenses.

31.     Southland did not lose contracts in Yazoo County as a result of the administrative changes.

32.     Every month, Burdine collected the Company's monthly subsidy checks in person from Yazoo County's municipal office. Burdine brought the Company's checks to BankPlus, and deposited them into an account titled "Emergystat of Yazoo" (even thought there was no entity named "Emergystat of Yazoo"), where Burdine used the subsidy checks to pay monthly payments on two ambulance loans Southland had with BankPlus. Any remainder of funds were to be wired to the Company's central BOV account. Payment on the ambulance loans or wire transfers to BOV did not require Southland to maintain a depository account at BankPlus.

## ii. The Emergystat of Yazoo BankPlus Bank Account

33.     When Lunan instructed Bell and C. Dubose to close the BankPlus account, Bell and C. Dubose insisted that the Company maintain a small "petty cash" or "imprest" account at BankPlus for "political" reasons.

34.     Based upon representations by C. Dubose and Bell that it was important for Southland to open and maintain a small, local imprest-like petty cash account for Yazoo County at BankPlus, Lunan agreed to allow such an account to be opened. The account was intended only to have a cap of a "few thousand dollars" and to be used for a local ordinary recurring business activity such as office supplies or utilities.

35.     Lunan's understanding was that on a monthly basis, receipts and records of the withdrawals from the intended petty cash account were forwarded to Vernon for verification, after which the Vernon office would replenish the account to its capped maximum amount.

36.     Instead of closing the existing depository account at BankPlus and opening an imprest-like petty cash account in its place, C. Dubose, Bell and BankPlus merely added C. Dubose's name as a signatory to Emergystat of Yazoo's existing depository bank account at BankPlus – that was maintained by the prior owner (Glenn Crawford). That was the account which Lunan had ordered to be closed when Southland acquired Emergystat.

37.     At that time, the bank card showed that Sonny Burdine, Sonny Burdine's daughter and Glenn Crawford were signatories to the BankPlus account.

38.     BankPlus added C. Dubose's name without requiring a board resolution or corporate authorization document from Southland, as required by law. Upon information and belief Lunan believes that Burdine facilitated the unauthorized addition of C. Dubose to the BankPlus account. BankPlus' failure to follow procedures and the law allowed C. Dubose to

have access and control over the BankPlus account even thought that had never been authorized by Lunan or Paladin or Southland.

39.     After adding C. Dubose's name to the account, C. Dubose and Bell informed Lunan that they had closed the account and opened the imprest account in its place. Had BankPlus requested a board resolution when C. Dubose added his name for the account, Lunan would have known that the old account had not been closed as Lunan had directed and as C. Dubose and Bell had reported.

40.     Because C. Dubose had control over the BankPlus account, he and Bell were able to take subsidy revenues without prior knowledge or consent from Southland. The Individual Defendants used this account to divert funds from the Company to themselves, as outlined in detail below. This practice avoided the detection of the Vernon office in the same way that the prior owners had avoided detection.

41.     Lunan did not suspect the activities in the BankPlus account because – unlike the Company's other depository accounts – a petty cash account would not require official signatures for check writing. Lunan was signatory to each of Southland's other depository accounts. Had Lunan intended the BankPlus account to likewise be a depository account, Lunan would have made sure that his name was on the bank card as well. However, BankPlus knew the account was to be maintained only as a "petty cash account" and not a fully functioning depository account. BankPlus also knew that Emergystat was now owed by Southland, not Crawford, and accordingly, BankPlus knew that old authorizations and accounts were not valid and should not have been allowed to be utilized without a valid Southland corporate resolution.

## C. BankPlus' Loan to Southland and Personal Loan to C. Dubose Were Secured By Lunan's Paladin Shares

42. In December 2005, C. Dubose and Bell told Lunan Southland was experiencing a temporary cash shortage due to reduced collection activities because of year-end holidays. Unbeknownst to Lunan, this shortage was actually the result of Defendants' unauthorized takings to date. Because of the shortage, Lunan agreed to co-borrow funds from BankPlus with Burdine to provide temporary working capital for Southland.

43. To secure the loan, Lunan pledged 1,000,000 of his personal shares of Paladin Holdings, Inc., which were worth $1,500,000 at the time. According to the agreement, Lunan's shares were to be returned by BankPlus immediately upon the payoff of this loan.

44. At some point after the first loan was transacted, unbeknownst to Plaintiffs, C. Dubose arranged for the Company to repay the first loan in full and to use Lunan's shares to secure a second private loan to Burdine in the amount of $200,000. Defendant C. Dubose used the funds from his second personal loan to deposit funds to the Company as a "loan" in an effort to provide cover to draw additional funds from Southland under the guise and subterfuge of getting "repayment" for "loans."

45. Contrary to the terms of the first loan agreement, BankPlus did not return Lunan's shares when the original note was paid in full. At the time of the first loan's repayment, Lunan's shares had a market value of over $1,000,000. Instead, the shares remained in BankPlus custody unavailable to Lunan. BankPlus' retention of the shares was contrary to the terms of the loan security agreement between Lunan and BankPlus.

46. Defendants C. Dubose and Bell partially repaid the second loan with Southland funds which they unlawfully took to conceal the loan from Lunan. However, C. Dubose eventually defaulted on the loan, forfeiting Lunan's Paladin shares to BankPlus.

47. Neither Lunan nor Southland was ever informed of the repayment of the original loan for which the shares were initially pledged nor were Lunan or Southland ever informed of C. Dubose's second personal loan.

48. BankPlus accepted the Company funds and applied them to the personal loan without authorization or verification from Southland's CEO or Board of Directors.

## D. The Unlawful Takings by C. Dubose and Bell Through the BankPlus Account Were Concealed From Lunan Until 2008

49. In late 2008, Plaintiffs' staff accountant, Laurie Guthrie informed Lunan that Defendant C. Dubose had been using the Company's unauthorized Emergystat of Yazoo BankPlus account to pay for capital improvements to C. Dubose's personal property without Plaintiffs' knowledge or consent. Plaintiffs requested that Southland's Vernon-based accounting staff forward all BankPlus bank statements to the Company's Kingsport office.

50. Plaintiffs discovered that over the course of three years, the Individual Defendants stole millions from Southland to enrich themselves and cause Southland's financial failure. In the event of the Company's collapse, the Individual Defendants could acquire the Company's assets and appropriate the highly-profitable business for themselves.

51. The Individual Defendants engaged in the systematic unauthorized taking of negotiable instruments, unauthorized wire transfers to pay personal expenses, unauthorized personal use of company gasoline credit cards, and taking of other corporate monies and assets from the Company.

52.     The records Plaintiffs have been able to reconstruct show that during the period of 2005 through 2008, the Individual Defendants diverted approximately $2,754,348 of Southland's funds to the Emergystat of Yazoo BankPlus account, which they controlled clandestinely. Furthermore, the collective actions of the Defendants have caused the Plaintiffs lose approximately $45 million in annual revenues, as well as to suffer the complete loss of a business valued conservatively at $50 million, and at various times throughout 2005 to 2008 as high as $75 million to $100 million in the publicly-traded securities market.

53.     Eventually however, the aforementioned conspiracy began to undermine the financial and operating condition of Southland as its cash resources were drained by the Individual Defendants' unauthorized takings of critical operating capital. The Company ceased operations in January 2008, when it could no longer afford its liability insurance, thus causing the loss of revenue producing.

54.     Alan Walls, Southland's Chief Financial Officer, facilitated the takings by permitting the takings and providing cover for Bell and C. Dubose.[1]

### i.  C. Dubose's Unlawful Conduct

55.     From January 2005 through 2008, Defendant C. Dubose took approximately $222,665.00 in the form of "cash" checks to himself drawn on Emergystat of Yazoo's account at BankPlus without authorization. C. Dubose also made unauthorized disbursements from the Company's Emergystat of Yazoo BankPlus account in the amount of $211,356.00. C. Dubose unlawfully took approximately $1,350,000 from the Company's Emergystat of Yazoo BankPlus account.

---

[1] Walls' actions are the subject of separate pending litigation. *See Southland Health Services, Inc., et al. v. Bank of Vernon, et al.*, No. 7:08-CV-2414 (N.D. Al.).

56.     Throughout 2006 to 2008, Defendant C. Dubose maintained a personal account at BankPlus, which he used to facilitate his unauthorized taking of funds from Plaintiffs with the knowledge of the other Defendants. Deposits to his personal account consisted solely of billing receipts payable to the company.

57.     Plaintiffs' investigation has revealed that:

a.      Defendant C. Dubose deposited very significant sums of Southland revenue into Southland's account at BankPlus;

b.      Defendant C. Dubose subsequently wrote himself checks from Southland's Emergystat of Yazoo BankPlus account to himself and to pay C. Dubose' loan from BankPlus and that was maintained in secret in the amount of $249,387, including cash-back from deposits.

c.      Defendant C. Dubose indirectly abstracted $150,000, which included over $50,000 for improvements to his personal real estate.

d.      Defendant C. Dubose wired from his personal BankPlus account $25,000 from the Company remittances to his personal BOV & Citizens account and another estimated $125,000 from his personal account; and

e.      The total takings were approximately $540,000.

58.     In 2006, C. Dubose deposited approximately $128,566.00 of diverted billing receipts payable to the company into his personal account at BankPlus which was taken without authorization from Plaintiffs.

59.     In 2007, C. Dubose deposited approximately $263,555.00 of diverted billing receipts payable to the company into his personal account at BankPlus which was taken without authorization from Plaintiffs.

60.     In 2008, C. Dubose deposited approximately $31,835.00 of diverted billing receipts payable to the company into his personal account at BankPlus which was taken without authorization from Plaintiffs.

61.     From 2005 to 2008, C. Dubose issued Southland checks to himself drawn on Southland's accounts at BankPlus in the amount of approximately $149,665.00 in addition to the amounts enumerated above.

62.     From 2006 to 2008, C. Dubose diverted and deposited to his personal account at BankPlus $432,757.00 of third party checks issued from clients of Emergystat and made payable to Emergystat, thus depriving Southland of these funds at critical times. C. Dubose subsequently transferred approximately $181,178.00 to the unauthorized Emergystat of Yazoo BankPlus account which he unlawfully took for his own use.

### ii.     Defendant Bell's Unlawful Takings

63.     Defendant Bell accepted unauthorized checks written from the Emergystat of Yazoo account at BankPlus and deposited them into his personal account at West Alabama Bank & Trust. These checks were hand-signed by C. Dubose.

### E.     Sandra Dubose

64.     Defendant S. Dubose knowingly or recklessly allowed her bank account to be used by C. Dubose to facilitate and conceal the misappropriation of funds by Bell and C. Dubose.

### F.     BankPlus Willingly Participated in Individual Defendants' Wrongdoings

65.     In September 2010, Sonny Burdine informed Lunan that Howard Webb, Vice President of BankPlus, had revealed to Burdine that Defendants C. Dubose and Bell were kiting checks from the BankPlus account. Webb allowed the continued unauthorized use of

the Company BankPlus accounts while this illegal activity was occurring. Although BankPlus, Burdine and Webb were under a duty to disclose the illegal activity to Plaintiffs, none of them ever did so. BankPlus' failure to disclose this material fact ultimately resulted in the closing of the Company.

66.     After Southland's closing, according to Burdine, Defendants BankPlus and C. Dubose sold the Company's vehicles financed by BankPlus with no repossession process and with all excess funds going to C. Dubose, instead of Southland.

67.     After Southland's closing, Burdine admitted to Lunan he knew that Defendant C. Dubose had cashed at least one third-party check written out to the Company at BankPlus without the proceeds being deposited into the Emergystat of Yazoo account.

68.     BankPlus did not follow reasonable commercial bank practices or FDIC guidelines to protect their customers' accounts, and they violated several criminal statutes of the Bank Secrecy Act, the Patriot Act, and AML and SAR requirements.

69.     Defendant BankPlus acted in bad faith in allowing C. Dubose and Bell to control and misappropriate Southland assets:

> (i)     BankPlus knew that Southland and/or Paladin were a publicly traded company;
>
> (ii)    BankPlus knew that Defendant C. Dubose was a fiduciary for the Company;
>
> (iii)   Without authorization, BankPlus added Defendant C. Dubose's name as a check signer to the prior owner's bank card;
>
> (iv)    BankPlus was notified by Alan Walls that the Company was under new ownership and that the bank cards needed to be changed;
>
> (v)     BankPlus did not obtain new bank signature cards and Board authorization when notified of the change of ownership but instead allowed Defendant C. Dubose to add his name to the obsolete card;

(vi) BankPlus did not require a Board resolution before adding a signer to the Company account;

(vii) Howard Webb, Vice President of BankPlus, breached his fiduciary duty by not notifying Defendants C. Dubose and Bell's superiors of these Defendants' check kiting and unlawful taking, and under the theory of respondent superior, Webb's actions are attributable to BankPlus;

(viii) BankPlus converted shares belonging to Larry Lunan for the benefit of Defendant C. Dubose;

(ix) BankPlus allowed Defendant C. Dubose to deposit third-party checks made out to the Company into C. Dubose's personal account, facilitating his unlawful taking and conversion;

(x) BankPlus allowed Defendant C. Dubose to transfer excessive Company money to himself with knowledge that C. Dubose was a fiduciary of the Company and without investigation, as required by federal law and good banking practices;

(xi) BankPlus allowed Defendant C. Dubose to wire transfer excessive Company funds to his personal account at BOV and Citizens Bank;

(xii) BankPlus failed to forward Company statements to Southland's business address and instead allowed C. Dubose to divert the request;

(xiii) BankPlus, without Southland Board authorization, allowed Defendant C. Dubose to dispose of Company assets, in the form of ambulances, etc., with the excess proceeds going to C. Dubose;

(xiv) BankPlus allowed Defendant C. Dubose to pay personal loans with Company funds without authorization from the Company's CEO and/or the Board of Directors; and

(xv) BankPlus did not disclose all of the above material facts to Lunan and/or Southland, thereby aiding and abetting the misappropriation scheme.

70.     In total, Defendant BankPlus allowed Defendant C. Dubose to cash or deposit at least $400,000 in checks written on the accounts of Southland or its affiliates into his personal account at BankPlus. Defendant BankPlus knew or should have known Defendant C. Dubose's annual salary was less than half of the total of the checks presented.

71.     Upon information and belief, the Defendants herein were aware of, or should have been aware, or were party to, the misappropriation scheme and enterprise by Defendants C. Dubose and Bell and others. Neither Lunan nor any officer of Southland, other than Bell, C. Dubose and Walls was aware of these activities.

72.     BankPlus' failure to inform Lunan of C. Dubose's irregular and fraudulent banking activities is especially egregious in the light of the fact that BankPlus required Lunan to pledge his personal assets for Southland debt (Burdine/Lunan loan) obligations it held.

73.     Defendants were aware that C. Dubose's depositing, cashing or otherwise converting Southland corporate funds, and failing to inform Southland of such conversion, was in direct contravention of BankPlus' policy and procedures and state and federal banking laws. BankPlus was also aware that the conversion of funds denied Southland the use of its own funds needed for the continued operation of the company.

74.     Any and all applicable statutes of limitation have been tolled by Defendants' acts of fraudulent concealment and suppression. Plaintiffs were unaware and were not informed of the Emergystat of Yazoo BankPlus account being used for personal deposits and other personal activity by C. Dubose and Bell. After the investigation began, Plaintiffs discovered that the Company's BankPlus statements had been removed from the Vernon office. Plaintiffs wrote to Howard Webb at BankPlus requesting copies of the Company's statements along with a request for C. Dubose's personal statements. Plaintiffs requested

Defendant C. Dubose's statements because the only deposits to his account were Company remittances. BankPlus refused both requests. Thus, BankPlus concealed information from Plaintiffs and prevented Plaintiffs from discovering critical facts necessary to bring a claim at the earliest possible time.

## G. Unnamed Co-Conspirators Facilitated The Scheme To Wrongfully Take Southland Assets Through Unauthorized And Fraudulent Banking Transactions

75. Defendants' conduct was aided by the conduct of individuals and entities who are defendants in related ongoing litigation. *See Southland Health Services, Inc., et al. v. Bank of Vernon, et al.*, No. 7:08-CV-2414 (N.D. Al.).

76. Bank of Vernon ("BOV"), aided and abetted, facilitated and concealed the misappropriation scheme. BOV is an Alabama banking corporation, doing business in Vernon, Alabama, with its principal place of business at 44825 Highway 17 Vernon, Alabama 35592. Southland maintained its operating and payroll accounts at BOV from long before Lunan and Paladin acquired Southland. BOV allowed C. Dubose and Bell to engage in unauthorized transactions involving Southland monies and concealed same from Plaintiffs.

77. West Alabama Bank and Trust, (hereinafter "WABT") is an Alabama banking corporation. WABT allowed Bell to engage in unauthorized banking transactions involving Southland monies and concealed same from Plaintiffs. WABT aided and abetted, facilitated and concealed the misappropriation scheme.

78. Citizens State Bank, (hereinafter "CSB") is an Alabama banking corporation. Southland maintained accounts at CSB and CSB was a lender to Southland. CSB allowed C. Dubose and Bell to engage in unauthorized transactions involving Southland monies and

concealed same from Plaintiffs. CBS aided and abetted, facilitated and concealed the misappropriation scheme.

79.     Each of the foregoing banks were conduits for the scheme by C. Dubose and Bell to wrongfully take Southland assets through BankPlus accounts and dissipate Southland's corporate assets.

## COUNT I

### VIOLATION OF MISS CODE ANN. 75-3-420 - CONVERSION
### Against All Defendants

80.     Plaintiffs repeat and realleges each and every preceding allegation as if more fully set forth herein.

81.     MISS. CODE ANN. 75-3-420 provides in pertinent part as follows:

> The law applicable to conversion of personal property applies to instruments. An instrument is also converted if it is taken by transfer, other than a negotiation, from a person not entitled to enforce the instrument or receive payment.

82.     Defendants C. Dubose, Bell and BankPlus converted checks payable to Southland or an affiliated subsidiary, indorsed these checks, and deposited said checks into his personal account at BankPlus as detailed above.

83.     Defendant BankPlus acted in bad faith in accepting for payment or deposit the instruments identified above as well as refusing to repay the amounts represented by such instruments. The acceptance for deposit and cashing of the instruments in question and the refusal to repay the monies in question was and is in direct contravention to commercially reasonable practices and has resulted in a conversion of the corporate funds of the payees identified above.

84.     Defendants Bell and C. Dubose, without authorization, indorsed checks made payable to Southland or its subsidiaries, and either cashed or deposited these funds in C. Dubose individual accounts at BankPlus. Additionally, Defendants Bell and C. Dubose took blank corporate checks from the Plaintiffs' corporate offices and forged signatures on these instruments. Defendants Bell and C. Dubose then presented these stolen and forged checks to BankPlus, who in turn either cashed these forged instruments or deposited them into C. Dubose's personal accounts or applied the funds toward payment of C. Dubose's personal loans.

85.     BankPlus had a duty to inquire as to account transactions by Defendants Bell and/or C. Dubose involving Southland revenues.

86.     The failure on the part of BankPlus to make such inquiry was a breach of duty they owed Plaintiffs, and makes them liable to Plaintiffs for the amount of the checks for money received by BankPlus.

87.     Plaintiffs, as a direct and proximate result of BankPlus' negligent, wanton and/or willful failure to comply with all applicable statutory standards of conduct and/or to follow proper banking practices and commercially reasonable practices and verify the propriety of C. Dubose and Bell transactions have been caused to suffer a loss in an amount of not less than $50,000,000.

88.     BankPlus converted monies rightfully belonging to Plaintiff Southland (or its wholly owned subsidiaries) by allowing negotiable (as defined under MISS. CODE ANN. 75-3-104(a)(1)-(3)), instruments made payable to Southland to be cashed by or on behalf of Dudley Bell and/or Clanton C. Dubose and the proceeds thereof rendered to C. Dubose and/or Bell. Alternatively, BankPlus allowed negotiable instruments payable to Southland to be deposited

into the account of C. Dubose or to pay personal loans of C. Dubose from BankPlus and the proceeds thereof credited to, and available for the benefit of, C. Dubose.

89.    Defendants C. Dubose and/or Bell were persons not entitled to enforce the aforesaid negotiable instruments nor authorized to have possession of the negotiable instrument or the proceeds thereof.

90.    At all relevant times Southland or its subsidiaries was the sole payee of the negotiable instruments and had received delivery of the negotiable instruments in the normal course of its business directly or indirectly.

91.    As a result of the conversion, Plaintiff Southland has been deprived and divested of funds purportedly belonging to it. The deprivation of those funds was the proximate cause of Southland's inability to continue its business and eventually caused the collapse of Southland.

92.    Plaintiff Southland has therefore been damages in at least the amount of $50,000,000.

93.    Defendants' conduct, actions and inactions warrant the imposition of punitive damages.

## COUNT II

### BAD FAITH AND/OR LACK OF GOOD FAITH AND CONSEQUENTIAL DAMAGES UNDER MISS. CODE ANN. 75-4-103(E) - FAILURE TO EXERCISE ORDINARY CARE AND BAD FAITH Against Defendant BankPlus

94.    Plaintiffs repeat and reallege each and every preceding allegation as if more fully set forth herein.

95.    MISS. CODE ANN. 75-4-103(e) provides as follows:

The measure of damages for failure to exercise ordinary care in

handling an item is the amount of the item reduced by an amount that could not have been realized by the exercise of ordinary care. If there is also bad faith it includes any other damages the party suffered as a proximate consequence.

96. BankPlus' actions and inactions as set forth above constituted a failure to exercise ordinary care in that BankPlus failed to ensure that BankPlus followed commercially reasonable practices and compliant procedure to adequately protect the assets of Southland, its customer.

97. BankPlus owed a duty to Plaintiffs to exercise ordinary care and act in good faith in handling Plaintiffs' assets and in maintaining Plaintiff's accounts at BankPlus.

98. BankPlus breached that duty as alleged herein.

99. BankPlus' breach of duty was accompanied by bad faith.

100. BankPlus' actions and inactions proximately caused loss and damage to Plaintiffs, including the loss of monies and other damages proximately caused by Defendants breaches including the collapse of Plaintiffs' business in the amount of at least $50,000,00.

## COUNT III

### FOR BREACH OF FIDUCIARY DUTY
### Against All Defendants

101. Plaintiffs repeat and reallege each and every preceding allegation as if more fully set forth herein.

102. Defendants Bell and C. Dubose as officers of Southland owed fiduciary duties to Plaintiffs, maintaining Plaintiffs' accounts at BankPlus.

103. Defendant BankPlus owed a fiduciary duty to its banking customer, Southland, based upon BankPlus' handling of Southland's accounts and prior dealings with Southland and Lunan and as escrow for Lunan's shareholdings in the Company.

104.    BankPlus knew at all relevant times that Bell and C. Dubose were fiduciaries of Southland and/or Paladin and/or Lunan.

105.    BankPlus' fiduciary duty required it to exercise care in preserving Plaintiffs' assets entrusted to BankPlus and to make inquiry with respect to Bell's and C. Dubose's transactions involving instruments payable to Southland or instruments drawn upon Southland accounts for their personal benefits.

106.    BankPlus failed to do so and such failures as set forth herein, constituted a breach of BankPlus duties and makes BankPlus liable for C. Dubose and Bell's fiduciary breaches.

107.    Under Tennessee law, applicable here, in addition to Mississippi law, (West's Tenn. Code Ann. 47-3-307) BankPlus breached its duties to Southland when it allowed Bell and C. Dubose to cash checks and/or deposit checks payable to Southland for their personal benefits.

108.    BankPlus' knowledge that C. Dubose and Bell were fiduciaries makes Defendants liable under Tennessee and Mississippi law for C. Dubose and Bell's conversion of monies through the cashing and/or depositing into their personal accounts, checks payable to Southland.

109.    Defendants' conduct was the proximate cause of Plaintiffs' damages.

110.    Plaintiffs suffered loss and damage as a result of the Defendants' actions including loss of monies unlawfully taken by C. Dubose and Bell and the destruction of value of Southland, including lost revenues and profits and the value of Southland in the amount of at least $50 million.

## COUNT IV

## AIDING AND ABETTING
## BREACH OF FIDUCIARY DUTY BY BELL AND C. DUBOSE
### Against Defendant BankPlus

111.    Plaintiffs reallege and incorporate by reference all preceding paragraphs and counts as though fully set forth herein.

112.    Defendant C. Dubose had a duty as Chief Operating Officer of the Plaintiffs, including Southland and Paladin to act loyally toward Southland and in good faith with the care an ordinarily prudent person in a like position would exercise under similar circumstances and in a manner that he reasonably believes to be in the best interest of the companies.

113.    Defendant Bell had a duty as an officer of Southland to act in good faith and with the care an ordinarily prudent person in a like position would exercise under similar circumstances and in a manner that he reasonably believes to be in the best interest of the companies.

114.    Defendants C. Dubose and Bell breached their duty of loyalty to the Plaintiffs corporations by engaging in self-dealing and usurping corporate opportunities.

115.    Defendant BankPlus knew that Bell and C. Dubose owed fiduciary duties to Southland.

116.    Defendant BankPlus knew that Bell's and C. Dubose's participation in the conversion scheme was a breach of their respective fiduciary duties.

117.    BankPlus knew that its acts and omissions facilitated, aided and abetted the breach of fiduciary duties by Southland's officers as described above.

118.    BankPlus' conduct was the proximate cause of Plaintiffs' damages.

119. Plaintiffs suffered loss and damage as a result of the BankPlus' action including loss of monies taken by C. Dubose and Bell without Southland's knowledge or consent and the destruction of value of Southland including lost revenues and profits and the value of Southland in the amount of at least $50 million.

## COUNT V

### NEGLIGENT HIRING AND SUPERVISION
### Against Defendant BankPlus

120. Plaintiffs reallege and incorporate by reference all preceding paragraphs and counts as though fully set forth herein.

121. Defendant BankPlus had an affirmative duty to Plaintiffs to properly train and supervise its employees, specifically its tellers, with respect to reporting guidelines under the Bank Secrecy Act, and to prevent the misuse of accounts under the control of Defendant BankPlus for the purpose of fraud, conversion and the violation of all applicable federal laws.

122. Defendant BankPlus knew or should have known that its employees behaved in a dangerous or otherwise incompetent manner by allowing the Individual Defendants to deposit or cash stolen instruments. Tellers were on the premises of Defendant BankPlus for the purpose of performing work for the Defendant, and used the instrumentalities of Defendant BankPlus in furtherance of the breach of duty to Plaintiffs.

123. Defendant BankPlus, having this knowledge, failed to supervise its employees adequately, or failed take other action to prevent the harm to Plaintiffs. The employees were within the line and scope of their employment with Defendant BankPlus at the time it conspired with Bell and C. Dubose or facilitated the misappropriation scheme.

124. The injuries suffered by the Plaintiffs were a reasonably foreseeable consequence of employer's negligent failure to train and supervise, and Plaintiffs were injured

as a direct and proximate result of Defendant BankPlus' failure to train and supervise their employees.

125. Defendant BankPlus is liable for its negligence in failing properly to instruct its employees, or failing to assure that the corporate policies of the bank were followed, and Defendant BankPlus knew or should have known that its employees were not following the bank's policies.

126. Plaintiffs have suffered and continue to suffer damage as a result of Defendants' conduct.

127. Defendants' conduct was the proximate cause of Plaintiffs' damages.

128. Plaintiffs suffered loss and damage as a result of the Defendants action including loss of monies taken by C. Dubose and Bell without the knowledge or consent of Southland and the destruction of value of Southland including lost revenues and profits and the value of Southland in the amount of at least $50 million.

## COUNT VI

### CIVIL CONSPIRACY
Against All Defendants

129. Plaintiffs reallege and incorporate by reference all preceding paragraphs and counts as though fully set forth herein.

130. On or about January 1, 2005, and continuing until July 4, 2008, Defendants maliciously conspired together to facilitate misappropriation from Southland.

131. The conspiracy consisted of Defendants Bell, C. Dubose and BankPlus as well as Walls, S. Dubose, Burdine and other individuals and banks. The common scheme of the conspiracy was: (1) to artificially and illegally depreciate the value of Paladin and Southland corporate assets, and (2) to utilize various bank accounts and banking relationships between

the Bell and C. Dubose and Defendant BankPlus in order to systematically devalue Plaintiffs' interests in the Company.

132. In violation of various state and federal laws, as set forth herein, and in furtherance of the conspiracy, Defendants Bell and C. Dubose committed the individual wrongful acts enumerated herein in order to take and otherwise convert and wrongfully appropriate Plaintiffs' corporate funds. These overt acts of the conspiracy were the proximate cause of Plaintiffs' injuries.

133. Defendants Bell and C. Dubose had actual knowledge of, and the intent to bring about, the object of the claimed conspiracy.

134. In committing these acts, the Defendants acted with malice, and the specific intent to defraud and damage the Plaintiffs.

135. As a direct and proximate result of these wrongful acts, Plaintiffs have been caused to suffer damages in excess of $50,000,000.

## COUNT VII

### CIVIL RICO: VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT 18 U.S.C.A. §§ 1961 et seq. (18 U.S.C. §1964(c)-(d)) Against All Defendants

136. Plaintiffs reallege and incorporate by reference all preceding paragraphs and counts as though fully set forth herein.

137. Plaintiffs Southland and Paladin were engaged in interstate and foreign commerce, and conducted business across interstate lines in seven different states.

138. In violation of 18 U.S.C. 1964(c) and (d), Defendants Bell and C. Dubose were employed by or associated with an enterprise, specifically their attempt to defraud Plaintiffs of funds for work performed in the course of Plaintiffs' business, and to impair the credit and

ability of Plaintiffs to conduct Plaintiffs' business. The racketeering enterprise, within the meaning of 18 U.S.C. § 1961, was an association in fact of Bell, C. Dubose, BankPlus, and Alan Walls and other individuals and banks and based on each defendant's particular function within the enterprise, to take and convert corporate funds. These various associates functioned as a unit. The enterprise was an entity separate and apart from the pattern of activity in which it engaged. The common purpose of the enterprise was (1) to artificially and illegally depreciate the value of Paladin and Southland corporate assets, and (2) to utilize various bank accounts and banking relationships between Bell and C. Dubose and BankPlus in order to systematically defraud the Plaintiffs of the value of their interests in the companies.

139. All of the predicate acts of racketeering activity were part of the nexus of the affairs and functions of the racketeering enterprise.

140. BankPlus was able to commit the predicate offenses by virtue of its position in the enterprise, and/or involvement in the affairs of the enterprise.

141. All of the predicate acts of racketeering activity occurred after the effective date of 18 U.S.C. §1961 *et seq*.

142. The predicate acts of racketeering activity began on or about January 1, 2005.

143. The pattern of racketeering activity was ongoing and open ended.

144. Numerous schemes have been completed involving repeated criminal conduct that by its nature was repeated.

145. The predicate acts have the same or similar purposes, results, participants, victims, and methods of commission.

146. BankPlus conspired and agreed with C. Dubose and Bell to engage in the enterprise through a pattern of predicate acts. All of these acts were violations as defined by statute.

147. This enterprise was in direct violation of 18 U.S.C. §1956 (a)(1)(A)(i) and (B)(i), in that BankPlus, knowing that the funds involved in the financial transactions enumerated herein were proceeds of illegal activity, and that the further transactions after the takings of the funds were performed with the intent to promote the carrying on of specified unlawful activity, or were performed with the knowledge that the transaction was designed, in whole or in part, to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the unlawful activity. BankPlus also repeatedly violated 18 U.S.C. §1341 in furtherance of the enterprise.

148. Further, BankPlus, by its words and actions, objectively manifested an agreement to participate, directly or indirectly, in the affairs of the enterprise through the commission of the predicate crimes and transactions.

149. This enterprise directly affected interstate commerce, as the Plaintiffs were clearly engaged in interstate commerce in the line and scope of their business, and the purpose of the Defendants enterprise was to systematically impact the Plaintiffs' ability to continue to conduct said business. As a result, the unlawful and fraudulent enterprise of the Defendants to convert fees and monies of the Plaintiffs directly impacted interstate commerce, as did the Plaintiffs' closure of business locations in several states.

150. C. Dubose and Bell and banks and BankPlus operated or managed the enterprise through a pattern of racketeering activity, which included at least one hundred individual and distinct violations within the past three years, of conversion of Plaintiffs'

corporate funds via the use of the mails and/or wire transfers, as well as a pattern of transferring large amounts of purloined corporate funds though a complex series of bank transfers in and between Banks in Alabama and Mississippi, including BankPlus.

151.    Plaintiffs have been and continue to be severely and irreparably injured in their business and property as a direct and proximate result of the pattern of racketeering activity.

152.    In violation of 18 U.S.C. 1962(d), BankPlus also conspired to violate 18 U.S.C. §1961 *et seq.* with Bell and C. Dubose.  BankPlus conspired and agreed to commit the underlying predicate acts of forgery, mail fraud, check fraud and money laundering (the substantive 18 U.S.C. §1962(c) violations).  BankPlus conspired and agreed to commit these acts in furtherance of their conspiracy and enterprise.  Specifically, the BankPlus entered into an agreement to conduct or participate in the affairs of an enterprise through a pattern of racketeering activity as proscribed by subsection 1962(c), with the specific intent to defraud the Plaintiffs. In furtherance of this enterprise, BankPlus agreed to assist the enterprise's involvement in corrupt endeavors with the intent to violate the provisions of 18 U.S.C. §1961 *et seq.*

153.    The Plaintiffs have been injured by reason of the BankPlus' violations and conspiracy to violate 18 U.S.C. §1961 *et seq.*

### COUNT VIII

### BREACH OF CONTRACT
### Against Defendant BankPlus

154.    Plaintiffs reallege and incorporate by reference all preceding paragraphs and counts as though fully set forth herein.

155.    Plaintiffs and BankPlus entered into a contract whereby Plaintiffs allowed equity in valuable public companies was used to secure loan(s) to Defendant C. Dubose.

156.    Pursuant to terms of the agreement, BankPlus was obligated to return the equity to Plaintiffs when the loan obligation which was secured by the equity was repaid.

157.    When the original loan to C. Dubose was repaid, BankPlus failed to inform Plaintiffs and failed to release the security in breach of the agreement.

158.    BankPlus allowed C. Dubose to obtain a separate loan using the equity as security despite the fact that the agreement did not allow the security to be transferred to another loan.

159.    BankPlus breached the agreement and caused damage to the Plaintiffs.

160.    Defendants have failed to comply with their duties under all applicable law.

161.    Due to the ongoing, repeated and complex nature of the BankPlus' wrongdoing, Plaintiffs are unable to state with certainty the full extent and amount of the unauthorized takings through BankPlus accounts.

**WHEREFORE, PREMISES CONSIDERED**, Plaintiffs request that the Court enter an order requiring Defendants to provide an accounting by an independent auditor or accounting firm as to the full extent of the fraud, and to provide such other equitable and legal relief as is appropriate.

As a direct and proximate result of the foregoing misconduct and breaches of duty alleged herein, the Defendants are liable to the Plaintiffs, jointly and severally, in an amount not less than $50,000,000.

**WHEREFORE,** Plaintiffs pray that this Court shall:

(a)    Enter judgment for Plaintiffs and against Defendants on Counts I to VIII, as applicable;

(b)    Grant Plaintiffs compensatory damage for all damages suffered, including but not limited to a return of all corporate assets and

instruments wrongly tendered, accepted and/or converted by Defendants, together with allowable statutory interest;

(c)     Award the Plaintiffs punitive damages for the oppressive conduct of the Defendants as allowed, as well as treble damages as allowed by statute;

(d)     An award of attorneys fees and pre-judgment interest; and

(e)     Enter such further and additional relief to which Plaintiffs are entitled.

Dated: January 17, 2012

R. Wayne Culbertson, BPR 000765
119 West Market Street
Kingsport, Tennessee 37660
(423) 247-6161

**OF COUNSEL:**

SQUITIERI & FEARON, LLP
32 East 57th Street
12th Floor
New York, New York 10022
(212) 421-6492

**PLAINTIFFS DEMAND A JURY ON ALL ISSUES SO TRIABLE**